CHIEF JUSTICE WILLIAMS
delivered the opinion of the cohrt:
Rawleigh Colsten, of Berkley county, Virginia, published his will September 26, 1818, by which he devised his Kentucky land, with certain exceptions, to his three sons, Edward, Thomas, and Rawleigh Traverse, and his son-in law, Benjamin Watkins Leigh, “in trust to be by them sold and disposed of, if, and in such manner, as they should think best, hereby giving them and the survivor of them as full power for the sale and disposition of this property as I might myself exercise; and in trust further, that they shall divide the said land in kind, or the proceeds thereof, shall they deem it prudent to sell the same, equally between all my children;” and nominated his sons, Edward and Thomas, and his son-in-law, Benjamin Watkins Leigh, his executors.
By a codicil of September 2, 1820, finding himself unexpectedly involved for large sums of money, he revoked this, together with other devises, and directed, among other things, that “ all the lands I bold in the States, Kentucky, Ohio, and Illinois, shall be, and are hereby, constituted a fund for the payment of my debts ; and 1 hereby authorize and direct my executors to sell and dispose of *669 my sa.icl western lands, in such manner, and upon such terms, and at such times, as they shall deem most advantageous, and to apply said western lands themselves, or the proceeds of sale thereof, so far as necessary, to the payment of my debts. If any balance of the said fund hereby provided for the payment of my debts shall remain, after satisfaction thereof, the same shall be distributed as in the residuary clause of my will above directed.”
November 6, 1847, Edward Colsten, as the only surviving acting executor of his father’s will, and the only one who ever qualified in this State, by written power of attorney, authorized R. G. Samuels “ to take charge of and to rent, lease, sell, or otherwise to dispose of,” all the Kentucky lands devised to be sqld by Rawleigh Colsten in his will. Samuels, as agent under said letter of attorney, sold and conveyed to Trabue the one thousand acre tract in Marshall county, now in controversy.
January 1, 1850, Trabue sold and conveyed it to H. Monsarratt.
January 13, 1853, Monsarratt sold and conveyed it to Wm. Ramsay, who, on December 3, 1853, sold and conveyed it to Nelson Shields, who, and those claiming under him,, are now in possession, and the defendants to this suit.
Edward Colsten, in the year 1850, revoked his power of attorney to said Samuels.
April 3, 1857, appellants, as heirs and devisees of Rawleigh Colsten, brought an action ordinary to recover said land.
November 11, 1857, the answer of all the defendants (but Shields and his amended answer) was filed to said petition, and on their motion, it was ordered that this case be transferred to the equity side of the docket, and consolidated with the case of Colsten, &c., vs. J. Chaudet, &c., *670 and the answer filed in this case to be taken as their answer in the case on the equity side of the docket; and leave was given to the plaintiffs to file an amended petition.
An equity suit by the same plaintiffs against the same defendants had, at the same time, been filed for staying waste of timber, &c.
September 30, 1858, appellants also brought an ordinary suit in the Marshall circuit court against L. M. Flournoy and others, to recover another tract of one thousand acres in said county. A portion of the pleadings in said case are copied; but it is evident, that, though it appears said suit had been also transferred to equity, and consolidated with the one against Chaudet et al., that it was not adjudicated nor regarded by the court; hence, all that part of the record belonging to said suit is irrelevant and sm’plusage, and will be no further regarded by us.
The court having dismissed appellant’s suit against Chandet et al. absolutely, they have appealed.
The cause involves — 1. An inquiry into the power of the surviving and only acting executor to sell or delegate the power of sale and conveyance.
2. Whether the letter of attorney to R. G. Samuels should be regarded as established.
3. Whether the title of these appellees can be disturbed because of any alleged fraud between Trabue, the purchaser, and Samuels, the agent.
In Story’s Equity Jurisprudence, volume 2, section 1062, it is said: “ It is a general rule of law, that a mere naked power given to two cannot be executed by one; or given to three, cannot be executed by two, although the other be dead; for, in each case, it is held to be a personal trust in all the persons, unless some other lan *671 guage is used to the contrary. Then, suppose a testator, by his will, should give authority to A and B to sell his estate, and should make them his executors. In such a case, it has been said, that the survivor could not sell; but if the testator should give authority to his executors, eo nomine, to sell, and should make A and B his executors, then, if one should die, the survivor, it has been said, could sell. The distinction is nice; but it proceeds upon the ground that, in the latter case, the power is given to the executors, virtute officii; and, in the former case, it is mérely personal to the parties named.”
And in Sugden on Powers, chapter 3, section 2, article 1, page 165, it is said: “That where the authority is given to executors, and the will does not expressly point to a joint exercise of it, even a single surviving executor may execute it.”
In section 1060, Story’s Equity Jurisprudence, it is said, that “ if a testator should order his real estate, or any ■part thereof, to be sold for the payment of his debts, without saying who should sell, in such a case, a clear trust would be created. * * * * In the case put, of a trust for the payment of debts, if executors are named in the will, they will be deemed, by implication, to be the proper parties to sell; because, in equity, when lands are directed to be sold, they are treated as money; and as the executors are liable to pay the debts, and if the lands were money, as they would be the proper parties to receive it for that purpose, courts of equity will hold it to be the intent of the testator that the parties who are to receive and finally execute the trust are the proper parties to sell for the purpose.”
In section 790, 2 Story’s Equity Jurisprudence, it is said, that “ land directed or devised to be sold and turned into money is reputed as money.”
*672 And in section 791 it is said, “the ground of this latter doctrine is, that courts of equity will regard the substance, and not the mere form of agreements and other instruments, and will give them the precise effect which the parties intended in furtherance of that intention. It is presumed that the parties, in directing money to be invested in land, or land to be turned into money, intended that the property shall assume the very character of the property into which it is ,to be converted, whatever may be the manner in which that direction is given.” ,
In Mr. Cox’s valuable note to Cruse vs. Bailey (3 P. Will.), it is said: “If a testator should direct that his lands should be sold for the payment of his debts, or for other purposes, the question would arise, whether he meant to give the produce of his real estate the quality of personalty to all intents and purposes, or only so far as respected the purposes of his will; for, unless the testator has sufficiently declared his intention, not only that the realty shall be converted into personalty for the purposes of the will, but further, that the produce of the real estate shall be taken as personalty, whether such purposes take eflect or not, so much of the real estate, or of the produce of it, as may not, in the event, be required for any purposes of the will, from any cause whatsoever, will result to the heir-at-law.”
And in the able and exhaustive opinion of the Supreme Court of the United States, by Mr. Justice Washington (3 Wheaton, 563), this doctrine has a strong application ; for that was a devise by Robert Craig of his lands in Virginia to certain trustees, to be sold and the proceeds paid over to his alien brother, Thomas Craig. As the testator had no relatives who could claim *673 and hold the lands as heirs-at-law, the State of Virginia claimed in their stead, by escheat, upon the principle and authority of Roper vs. Radcliffe (9 Mad., 167, 181), in which the King’s bench, by six to five judges, decided, that, under the British statute, a Papist could not take land, nor any interest or profits or proceeds arising therefrom, and that, on a devise to sell the lands and pay the proceeds over to a Papist legatee, the Crown, being entitled to claim by escheat when there was no one to do so as heir-at-law, was entitled to the rights of such heir, and that he would be entitled to a resulting trust so far as it would be of value after paying debts and legacies; and that he could come into equity and restrain the selling more than would be sufficient for suph purpose, or he could pay these himself and demand a conveyance, and that equity will extend the same privilege to .the residuary legatee’; and, therefore, deduced from these principles the conclusion, that, as to such legatee, such a devise is to be deemed land in equity and not personalty; but the Supreme Court, with distinguished ability, scattered the sophistry and artificial reasoning of this case, overwhelmed it with an array of authority, and decided that, by the will of Robert Craig, he had converted his land into money, and had devised the money to his alien brother, who could take it, but not land, under the laws of Virginia, saying: “ It i's evident, therefore, from a view of the above cases, that 1he title of the heir to a resulting trust can never arise, except when something is left undisposed of, either by some defect in the will, or by some subsequent lapse, which prevents the devise from taking effect; and not even then, if it appears that the intention of the testator was to change the nature of the estate from land to money absolutely and entirely, and not merely to serve the pur *674 poses of the will. But the ground upon which the title of the heir rests is, that whatever is not disposed of remains to him, and partakes of the old use as if it had not been directed to be sold.”
By the codicil, the testator, Rawleigh Colsten, constituted this land a fund for the payment of his debts, and expressly directed his executors to sell and dispose of it; and if any balance remained after payment of debts, it •was to be distributed according to the provisions of the residuary clause of his will. More clearly defined and emphatic intention to convert the whole of this land into money for the purpose of paying debts, and distributing any surplus which might remain, could not well be expressed.
It then necessarily follows, that as this trust was confided to his executors, the title vested in them just as if it had really been converted; for in equity that which should be done will be regarded as done; and of consequence the trust could be executed by the surviving executor— the land could be sold and conveyed by him, especially as our statute (1 Morehead & Brown’s Statutes, page 666); fully authorized the surviving executor to sell the lands devised to be sold.
“Every person,” says Story on Agency, section 2, “not under disability, is treated as being sui juris, and capable not only of acting personally in all such matters, by his own proper act, but of accomplishing the same object through the instrumentality of others to whom he may choose to delegate, either generally or specially, his own authority for such purpose,” and “ hence the general maxim of our laws, subject only to a few exceptions, is, that whatever a man, sui juris, may do of himself, he may do by another; and as a correlative of the maxim, *675 that what is done by another, is to be deemed, done by the party himself.”
Had this devise been a mere naked power and a personal trust, it would have fallen within these exceptions; it, however, is not such, but is a full investiture of the title, as of personalty, in the executors, in their fiducial character, to be disposed of for the purposes of paying debts and distributing the remaining proceeds.
A.s to the authentication of the power of attorney, but little need be said. Even if it be conceded, as perhaps it should be, that the certificate of the two Virginia justices of the peace, who certified its acknowledgment, was legally defective, in not certifying that the principal subscribed it in their presence; yet their authentication rendered it morally certain that it was executed. But the oi’iginal letter of attorney was made an exhibit in an amended pleading, and' its authenticity has not been controverted; indeed, the amended petition of appellants, filed February 21, 1867, confesses it by saying, “that said Edward, after such qualification in Kentucky, executed a power of attorney to one G. R. Samuels (should be R. G. Samuels), authorizing him to sell said land.”
It is true, in a subsequent part of this amended petition, in relation to the copy of the power and its authentication, they say: “ If ever executed at all, was in itself, and in its effects, a nullity as matter of law; ” and that it “ has not upon its face, nor in its proof and authentication, any evidence sufficient in law to prove its execution, and, therefore, they do deny that said paper referred to was executed by said Edward Colsten.” This is a special denial, predicated on the defective authentication, and not on the real genuineness of the instrument; therefore, the chancellor would regard it as effective authority, *676 and if it did not legally authorize a conveyance of the title, would compel the parties to execute a conveyance in accordance with its provisions, unless there should, be other sufficient preventing causes; and whilst it would have been more formal to have ordered a conveyance, yet, as appellants will be barred by the judgment, the legal effect will be the same.
A judgment of the Graves circuit court annulling the sale and conveyance of lands by Samuels to Trabue is set up, but not filed; but the allegation shows that this proceeding and judgment was after Trabue had sold this land to Monsarratt; for it avers and charges “that all of said purchasers of the land in this case were lis pendens purchasers, and their purchases, except that of Monsarratt, as before said, were made after these plaintiffs had brought their cross-suit aforesaid in Graves against Samuels, Trabue, and others.”
This judgment was rendered in a suit brought by Trabue to perfect said power of attorney to Samuels, and his conveyances under it, against the executor and unknown heirs of Rawleigh Colsten, in which said heirs and appellants filed air answer and cross-petition.
But as Monsarratt, the vendee of Trabue, was not a party, he could not be affected by that litigation ; and, indeed, if he had been a party, his title could not have been disturbed, unless it had been shown he was not a bona Jide purchaser for a valuable consideration ; for whatever may have been the character of commerce between Samuels and Trabue, the innocent vendees of the latter could not be affected thereby, and who had parted wúth a valuable consideration, relying upon Samuels’ authority and the evidence of sale from him. And, as Monsarratt is not and could not be affected by said adjudication, and nothing in this case contaminating him with bad faith, *677 his vendees cannot, any more than himself, be affected by such; neither are they affected by it, because they are neither parties nor lis pendens purchasers, but are invested with all the rights and equities of their remote vendor, Monsarratt.
Although the case was transferred to equity on motion of defendants, this was neither objected to nor exceptions taken at the time, so far as appears from this record, and is not, therefore, now an available error.
As by order of court the original answer to the suit in ordinary was to be regarded as an answer to the equity suit, and as both parties subsequently filed amended pleadings, some of -which seem informal, yet we have regarded them, as they were intended, as forming the true issues.
Wherefore, the judgment is affirmed.